LEROY H. GATES v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY.

FILED OCTOBER 17, 1894.  No. 5804.

1. Carriers of Goods: DUTY TO DELIVER CONSIGNMENT. The duty of a common carrier of goods is not only to safely carry, but to deliver; and delivery must be made within a reasonable time, at the place, and to the person to whom the goods were consigned.

2. ———: ———. The delivery of goods by a common carrier to the consignee thereof is made at the peril of the carrier, unless when made the consignee surrenders the bill of lading either made or indorsed to himself.

3. **Assignability of Bill of Lading.** The bill of lading issued by carrier to the owner or shipper is the symbol of ownership of the goods shipped, and though not negotiable is assignable.

4. **Carriers: DELIVERY OF GOODS: SURRENDER OF BILL OF LADING.** A railway company received from a connecting carrier at Omaha, Nebraska, a car of potatoes, consigned to W. at Bradshaw, Nebraska. W. was the agent of the owner of the potatoes. On arrival of the car of potatoes at Bradshaw the railway company notified W. thereof, and at his direction delivered the potatoes to one K., to whom W., acting for the owner, had sold the potatoes. *Held*, (1) That the delivery to K. was, in effect, a delivery to W., the consignee; (2) that K. having failed to pay for the potatoes, the carrier was not liable to the owner thereof for their value, although the bill of lading for the goods was not surrendered to the carrier before delivery, as the instruction of W. to deliver to K. was, in effect, the owner's instruction, and it not appearing that the bill of lading for the goods had been assigned or indorsed to any one by the owner or shipper.

ERROR from the district court of Merrick county. Tried below before SULLIVAN, J.

A statement of the case appears in the opinion.

*W. T. Thompson*, for plaintiff in error:

In argument reference was made to the following authorities: On the first proposition discussed in the first paragraph of the opinion: *Tootle v. Maben*, 21 Neb., 618; *Easterly v. Van Slyke*, 21 Neb., 611; *Newton Wagon Co. v. Diers*, 10 Neb., 284; *Turner v. O'Brien*, 11 Neb., 108; *Steele v. Russell*, 5 Neb., 211; *Smith v. Evans*, 13 Neb., 314. On the second point in the first paragraph of the opinion: *Shepherd v. Lanfear*, 25 Am. Dec. [La.], 181; *Russell v. Livingston*, 16 N. Y., 515; *Adams v. Blankenstein*, 2 Cal., 413. On the third point in the first paragraph of the opinion: 1 Thompson, Trials, sec. 1160; Con. Stats., sec. 1791.

The second instruction given by the court upon request of the company was erroneous. (*Turner v. O'Brien*, 11 Neb., 109; *Sheldon v. Williams*, 11 Neb., 275; *Dunbier v. Day*, 12 Neb., 607; *Meredith v. Kennard*, 1 Neb., 319;

*Curry v. State*, 4 Neb., 545; *High v. Merchants Bank*, 6 Neb., 155; *Walrath v. State*, 8 Neb., 81; *Cropsey v. Averill*, 8 Neb., 152; *Hitchcock v. Shager*, 32 Neb., 477.)

The third instruction given by the court upon request of the company was erroneous. (*Edmunds v. Merchants Dispatch Transportation Co.*, 135 Mass., 283; *Price v. Oswego & S. R. Co.*, 50 N. Y., 213; *Duff v. Budd*, 3 Brad. & B. [Eng.], 177; *Sword v. Young*, 14 S. W. Rep. [Tenn.], 481; *Furman v. Union P. R. Co.*, 13 N. E. Rep. [N. Y.], 590; *Bank of Rochester v. Jones*, 4 Denio [N. Y.], 489; *Bean v. Sturtevant*, 28 Am. Dec. [N. H.], 389; *Harrington v. McShane*, 27 Am. Dec. [Pa.], 321; *Ward v. Green*, 16 Am. Dec. [N. Y.], 437.)

*A. W. Agee* and *Marquett & Deweese, contra*, cited: 1 Rorer, Railroads, 665; *Sumner v. Charlotte, C. & A. R. Co.*, 78 N. Car., 289.

RAGAN, C.

Leroy H. Gates sued the Chicago, Burlington & Quincy Railway Company (hereinafter called the "railway company") in the district court of Merrick county. Gates alleged as his cause of action against the railway company that on the 10th day of October, 1894, he delivered to it at Omaha, Nebraska, a car load of potatoes belonging to him, of the value of $513; that the railway company, for a consideration, undertook to safely and securely carry the car of potatoes to Bradshaw, Nebraska, and there deliver them to one A. B. Warrell, who was then and there his, Gates', agent; that the railway company did not deliver said car of potatoes to said Warrell or to any person authorized to receive the same. The answer of the railway company admitted that it received the car of potatoes, and contracted to carry them to Bradshaw, Nebraska, and there deliver them to Warrell, Gates' agent; and alleged that on their arrival at Bradshaw it delivered said car of

potatoes to Klock & Hankins by order of said consignee, Warrell. The reply of Gates denied the allegations of new matter in the answer. It will thus be seen that the chief issue litigated in this case was, whether Warrell instructed or authorized the railway company to deliver the car of potatoes to Klock & Hankins. The jury found this issue in favor of the railway company, and from the judgment pronounced upon such finding Gates brings the case here for review.

The errors assigned and argued in the brief of counsel for the plaintiff in error relate to the giving to the jury by the court of three instructions at the request of the railway company:

1. "The law does not favor double agencies; and where a person employs or procures an agent of a railroad company to act for him in the buying or selling of merchandise of any kind, such agent will, so far as such transaction is concerned, be deemed the agent alone of the person for whom he so acts in buying or selling of such merchandise, and not the agent of the railroad company. In this case, if you believe from the evidence that B. L. Foster acted in the interest and on the behalf of A. B. Warrell, and at his request in securing from Klock & Hankins an order for the car load of potatoes in question, and making the sale of such potatoes to Klock & Hankins, and in arranging for the assorting and weighing of the same, then you are instructed that in procuring such order and making such sale, and in conducting the transaction with Klock & Hankins concerning the sale and delivery of said potatoes, said Foster must be deemed the agent of said Warrell, and not of the said railroad company, and his action in delivering such potatoes to said Klock & Hankins will be binding on the plaintiff and said Warrell, and the defendant cannot be held liable for any of the acts of said Foster in delivering said potatoes to said Klock & Hankins." The correctness of this instruction is assailed on

three grounds: (1.) It is said that there was no issue made, either in the pleadings or evidence in the case, as to whether Foster, who was the railway company's agent at Bradshaw, was the agent of Warrell, the consignee of the car of potatoes, and for that reason the instruction is erroneous. The evidence in the case tended to show that Warrell had inquired of Foster whether the latter could find a purchaser for a car load or two of potatoes in Bradshaw; that Foster made some inquiries in Bradshaw for persons desiring to purchase a car load of potatoes, and that Klock & Hankins agreed to purchase a car load of potatoes of a certain quality at a certain price; that the car load of potatoes in controversy was shipped by Gates, or by Warrell, acting for him, to Bradshaw, consigned to Warrell, to fill the order given by Klock & Hankins to Foster; that after the car of potatoes arrived in Bradshaw, Klock & Hankins inspected them, and refused to take them because they were not of the quality they had agreed to buy; that communications immediately passed by wire between Warrell and Foster to the effect that Warrell instructed Foster to allow Klock & Hankins to take the potatoes, assort them, and do the best they could with them; and that in pursuance of these instructions from Warrell, Foster delivered the car of potatoes to Klock & Hankins. In view of this evidence we do not think that the instruction complained of is erroneous. (2.) The second objection urged to the instruction relates to the first sentence thereof. Counsel says: "The instruction is erroneous, because it contains a partial or incomplete statement of an abstract proposition of law, in this, that it contains the statement that 'Where a person employs or procures an agent of a railroad company to act for him in the buying or selling of merchandise, such agent will, so far as such transaction is concerned, be deemed the agent of the person for whom he so acts in the buying and selling of such merchandise, and not the agent of the railroad company.' * * * This rule is

given to the jury as an inflexible, inelastic, invariable rule. It is given without any exceptions, qualifications, or limitations whatever, while it is not an invariable rule that such an agent 'will be deemed alone the agent of the one for whom he acts in the buying or selling of such merchandise,' and especially is it not as applied to the case at bar." We do not think that the first sentence of this instruction misstated the law applicable to the facts in this case. The court did not tell the jury that one might not be an agent for two principals. He did tell them, and perhaps unnecessarily, that the law does not favor double agencies; and he told them that where a person employs the agent of a railroad company to act for him in the buying and selling of merchandise, such agent in such transaction is deemed to be the agent of the person for whom he acts in buying and selling, and that was correct. (3.) The third objection urged to the instruction is that it was couched in such langurge as to lead the jury to believe that there had been an actual sale of the potatoes in controversy to Klock & Hankins. We do not think that a fair criticism of the instruction.

2. The second error assigned relates to the giving by the court of instruction No. 2, as follows: " If you believe from a preponderance of the evidence that Klock & Hankins refused to accept the potatoes on their arrival, on the ground that they were in a bad condition and rotting, and that this fact was communicated to Warrell by Foster, and that Warrell thereupon directed Foster to have Klock & Hankins take the potatoes and assort them, and that Foster did, in pursuance of such direction, have Klock & Hankins take the potatoes from the car and assort them, then you are instructed that the defendant cannot be held liable for said potatoes, or for any difficulty or dispute which may have arisen between the plaintiff or Warrell on the one hand and Klock & Hankins on the other hand, and your verdict should be for the defendant." Counsel says

that this instruction is erroneous because it assumes that there was evidence in the record to show that Foster, the agent at Bradshaw, notified Warrell, Gates' agent, that Klock & Hankins has refused to accept the potatoes; and counsel insists that the record contains no such evidence. The evidence in the record is undisputed that Klock & Hankins did refuse to accept the potatoes, and that immediately afterwards communications by wire took place between Foster and Warrell with reference to the potatoes. Their testimony is as follows:

Foster's: Q. When you and Messrs. Klock & Hankins examined the potatoes in the car, state what they said about accepting the car load of potatoes.

A. They refused to accept them. I cannot quote their words, but they refused to accept them.

Q. Then what was done in the matter between you and them?

A. I tried to get them to take the car, and do the best they could with them, provided Mr. Warrell was willing, and told them I would go in and talk with him; and we all three went to the depot together.

Q. What occurred after you went to the depot?

A. Messrs. Klock & Hankins stopped at the window. I went into the office and called Mr. Warrell on the wire at Central City, and the following conversation took place: I explained as fully as I could to him the condition of the potatoes, and Mr. Warrell said, "Tell them to have the potatoes assorted." I turned around to the window and told them the conversation, and whether it was one of them or myself that said, "Have them assorted, and do the best you can with them," I don't remember, but I do distinctly remember that we three understood that that was the proposition to be made to Mr. Warrell on the wire in those words, and that Warrell assented to it.

Q. Now, please state, as near as you can, the language

you used in submitting their proposition to Mr. Warrell, and his reply.

A. To Mr. Warrell: "Shall they take the potatoes, and assort them, and do the best they can with them?" His reply was, "ay, ay,"—the customary assent in telegraphy.

Warrell's: Q. He wired you that the potatoes were rotten and that they would not accept them?

A. No, he did not.

Q. Do you want this jury to understand that, without having any notice that Klock & Hankins refused to accept the potatoes, you wired the agent at Bradshaw that they would have to sort them and weigh them?

A. He did not notify me.

Q. Do you mean to have the jury understand, at the time you wired the agent at Bradshaw, that Klock & Hankins would have to sort and weigh the potatoes; that you did not understand at that time they had refused to accept the potatoes?

A. I did not understand at that time.

Q. Why was it that you was telling the agent at Bradshaw that they would have to sort and weigh the potatoes, which you supposed they had accepted, sir?

A. He communicated with me, and it was just our talk over the wire.

Q. Do you mean to say that it is customary for an agent of a railroad company, when potatoes or merchandise are in a bad condition, to arrange with the customer about any settlement of any dispute between the seller and the purchaser of those things, or about arriving at their condition, the quantity of the good potatoes?

A. I did not consider there was anything to arrange at the time.

Q. Then why did you say to Foster that they would have to sort and weigh the potatoes, if there was nothing to arrange?

A. Simply because he asked me about it,—stated that there were some rotten potatoes in the car.

Q. What did he ask about the potatoes?

A. Simply told me there were some rotten potatoes in the car.

Q. You just now stated he asked you about the potatoes on account of rotten ones.    What do you mean by that?

A. I mean he called me up and told me there were some rotten potatoes in the car.

Q. You mean to say that was after Klock & Hánkins had accepted the potatoes?

A. My understanding was that they had accepted the potatoes at that time.

We think that this evidence was sufficient to justify the court in submitting to the jury the question as to whether Foster notified Warrell in the communication had with him by wire, that Klock & Hankins had refused to accept the potatoes.

3. "If you believe from all the evidence in this case that Warrell, the person to whom the potatoes were consigned, gave such instructions or directions to Foster concerning the assorting of the potatoes by Klock & Hankins, as might reasonably be, and were, understood by Foster to constitute an order or direction to deliver the potatoes to Klock & Hankins, and, acting on such instructions, Foster did deliver the same to Klock & Hankins, then such delivery must be deemed a delivery to said Warrell, and your verdict must be for the defendant."    Of this instruction counsel says : "This instruction is prejudicial and erroneous, for the reason that it, in substance, tells the jury that the defendant will be released from liability for a delivery to other than the consignee upon the slightest showing of care."    We do not think that the plaintiff in error has any just cause of complaint by reason of the giving of this instruction.    It is undoubtedly true that the contract of a common carrier is not only to safely carry but to deliver;

and delivery must be made within a reasonable time, at the place, and to the person to whom the goods are consigned. The whole question litigated in this case was whether the railway company delivered the goods to Klock & Hankins by order of the consignee, Warrell. The jury found that Warrell directed the railway company to deliver the goods to Klock & Hankins, and the evidence supports that finding. Such delivery, then, was, in effect, a delivery to Warrell, the consignee.

It is said by counsel that the delivery of this car of potatoes to Klock & Hankins was negligently made and unauthorized, because the bill of lading was not presented by them. Doubtless the rule is that the delivery of goods by a common carrier to the consignee thereof is made at the peril of the carrier, unless when made the consignee surrenders the bill of lading either made or indorsed to himself. (*Furman v. Union P. R. Co.*, 106 N. Y., 579; *Weyand v. Atchison, T. & S. F. R. Co.*, 39 N. W. Rep. [Ia.], 899.) The reason for this rule is that the bill of lading is the symbol of ownership of the property, and though not negotiable is assignable. A shipper may deliver goods to a common carrier consigned to a purchaser of such goods, and at the same time make a draft or bill of exchange on the purchaser for the price of the goods shipped and attach thereto the bill of lading and his indorsement thereon for the goods. In such a case as this, and like cases, if the carrier deliver goods to the consignee thereof without the surrender by him of such a bill of lading, such delivery would be made at the peril of the carrier; and if the consignee failed to pay for the goods the carrier would be liable to the shipper or owner for their value. (*Furman v. Union P. R. Co.*, 106 N. Y., 579.) But the case at bar does not fall within the rules stated above. Warrell represented the owner of the potatoes, and acted for him, and the evidence tends to show, and the jury have found, that the owner of the potatoes, or Warrell for him,

contracted for their delivery to Klock & Hankins. The railway company, then, has not violated its contract, and is not liable in this action. (*Dobbin v. Michigan C. R. Co.*, 21 Am. & Eng. R. Cases [Mich.], 85.) The judgment of the district court is

AFFIRMED.